THE STATE, EX REL. NATHAN V. COMPTON, PAYMASTER. OF THE THIhD REGIMENT OF THE NATIONAL GUARD· OF NEW. JERSEY, PROSECUTOR, v. EDWARD J. ANDERSON, COMPTROLLER OF THE STATE.

1. Under section 39 of the National Guard act of March 9th, 1869 (*Rev.*, *p.* 679), which directs that on the first Monday in April there shall be· paid to the paymaster of each regiment or battalion the sum of $500 per company for each company duly organized which at said time is. attached to the regiment or battalion, the said annual appropriation is due in advance, and is payable to the paymaster on the designated day for each company then duly organized and attached to his regiment or battalion, even though the company had not been so organized and attached for the whole of the preceding year.
2. The practice of the state officers has generally been in accordance with. this interpretation of the statute.
3. When the facts upon which the appropriation falls due are conceded, and the comptroller refuses ·to issue his warrant for the payment merely because he has taken a different view of the law from that entertained by the court, a *mandamus* will lie to compel him to issue· the warrant.

On rule for *mandamus*.

Argued at June Term, 1888, and June Term, 1889, before Justices DEPUE, VAN SYCKEL and DIXON.

For the relator, *Vail & Ward*.

For the comptroller, *J. P. Stockton, Attorney General*.

The opinion of the court was delivered by

DIXON, J.    The relator, who now is, and since May 6th,. 1885, has been, the paymaster of the Third regiment of the national guard of the State of New Jersey, applies for a writ of *mandamus*, directing the comptroller of the state to pay to· him $1,000, which he claims upon the following facts:    On July 15th, 1884, Company B became duly organized and

attached to said regiment, and has so continued ever since; on January 30th, 1885, Company F became duly organized and attached to said regiment, and has so continued ever since; in June, 1885, the comptroller paid to the relator $401 on account of Company B, and $90.42 on account of Company F, and in May, 1886, likewise paid $500 on account of each company. The relator insists that the sums paid in June, 1885, were due on the organization and attachment of the respective companies; that the payments made in May, 1886, were due on the first Monday of April, 1885, and that on the first Monday of April, 1886, the sum which he now demands became due on account of the said companies. On the other hand, the comptroller contends that the sums paid in June, 1885, became due on the first Monday of April, 1885; that those paid in May, 1886, were due only on the first Monday of April, 1886, and that the sums now claimed did not become due until the first Monday of April, 1887, before which date this proceeding was, presumably, instituted. In short, the debated question is, Whether the annual allowances to the companies of the national guard are payable in advance or not.

The question is one of statutory construction merely, and the first statute to be considered is that which directs the payment to be made—section 39 of the National Guard act of March 9th, 1869 (*Rev.*, p. 679), viz.: "That in lieu of the present provisions for uniforms or drill room or armory rent and pay, there shall be paid on the first Monday of April of each year, to the paymaster or acting paymaster of each regiment or battalion of the national guard, the sum of five hundred dollars per company for each company duly organized which at said time is attached to the regiment or battalion to which said paymaster or acting paymaster belongs, to be expended by said paymaster or acting paymaster only under the direction of the regimental or battalion board to which such paymaster or acting paymaster belongs, subject to the approval of the commandant of said regiment or battalion, for the purpose of procuring drill rooms and armories, for the purchase

of uniforms, and to defray other expenses incident to the existence of the regiment or battalion, or companies attached to the regiment or battalion; and for any company duly organized subsequently to the first day of April in any year, the paymaster or acting paymaster shall receive at the rate of five hundred dollars per year for the unexpired part of the year ending on the first day of April then next, to be expended only in the manner stated above."

Upon its face, this section seems to direct payments in advance. Such is the purport of the first clause, that the whole sum of $500 is to be paid on the first Monday of April, for each duly organized company which on that day is attached to the regiment or battalion, without any expressed requirement that the company shall have been so attached for the entire year preceding, although each company, at the first April in its existence, must have been so attached for only part of a year. To the same effect is the last clause of the section, that the proportionate part of $500 for each company organized after April 1st is to be received by the paymaster for the *unexpired* part of the year ending on the first day of April *then* next, the fair meaning of which is, that he is to receive it while yet the year is unexpired. A similar intention is, I think, exhibited by the language in which the object of transferring these moneys to the paymaster is declared, that he may expend them under the direction of the regimental or battalion board, for the purpose of procuring drill rooms and armories, for the purchase of uniforms, and to defray incidental expenses. An armory and uniforms are needed by a company forthwith upon its organization, and sections 36, 37 and 38 of this same statute expressly require or plainly imply that they shall be furnished for the company within two months after organization; and the section now under review directs that these moneys shall be expended by the paymaster in *procuring* these immediate necessaries, not in paying debts previously contracted for their procurement. Of course, I do not mean that the legislature must have deemed the allowance, payable for each company within two

months after organization, sufficient to pay for its uniforms and armory, and that subsequent allowances should not be used to meet debts previously contracted therefor; my meaning is merely that the legislative form of expression indicates a design to make provision for prospective purchases rather than for prior indebtedness.

Against this interpretation of the face of this section, several suggestions are made on behalf of the comptroller.

*First.* It is said that his only legal means of ascertaining what companies are duly organized and attached so as to entitle the paymaster to the prescribed allowance, is a certificate from the adjutant general showing what companies were in that condition at the preceding annual inspection, and hence the inference is drawn that the allowance is to be paid for the year in which such inspection had taken place. But the premise is not true. The law does not expressly provide how the comptroller shall be informed of the facts which will justify his warrant for the appropriation, and plainly the method suggested is inadequate. By the act of 1869 no time was set for the annual inspection; in 1873 it was directed to be held between September 1st and October 15th (*Rev., p.* 696); in 1878 the period between the 1st and the 20th day of May was substituted (*Pamph. L.* 1878, *p.* 120); and in 1883 the entire month of May was assigned for such inspection (*Pamph. L.* 1883, *p.* 104); nevertheless, always, the right to a full annual allowance has, by the terms of the statute, depended solely on the condition of the company on the first Monday in April. Evidently its *status* at the annual inspection is an unreliable index of its *status* at the time fixed for payment. Beside the files in the office of the adjutant general, there ought to be files belonging to each brigade and regiment, showing more approximately the facts on which the comptroller is to act. If these be insufficient for the exact information to which he is entitled, the power of the commander-in-chief is ample to secure for him official reports which shall render his duty plain.

*Secondly.* The comptroller urges that a company which, on the first Monday in April, is duly organized and attached, may immediately thereafter be disbanded, and that the legislature cannot have meant to require the payment of $500 for the year's use of a company which may exist perhaps only a few days. But in this position, it seems to have been overlooked that the paymaster, who is to receive the money, is a public officer, acting under official oath and bond as truly as is the state treasurer, and that if public money shall have come to his hands for defined public objects which have ceased before the funds are exhausted, he cannot legally use the residue for other purposes, but must restore it to the general treasury. The state's right to and control over that residue in the possession of the paymaster are the same as if it were held by the treasurer.

*Lastly.* The comptroller insists that the forfeiture of a company's annual appropriation, which, by the supplement of 1873 (*Rev., p.* 696, § 4), was to happen in case the company failed to parade at the annual inspection or to forward its annual report to the inspector general's office within a definite time thereafter, could not be enforced, if such appropriation had been paid to the paymaster in the preceding April. This provision certainly presents some difficulty, view it in what light you will. Assume, with the comptroller, that the annual appropriation is payable at the end of the year for which it is made, and that, if there had arisen a cause of forfeiture during the year, it would be his duty to withhold the entire appropriation, how are those obligations to be met which must have been incurred by public agents for public purposes before the cause of forfeiture occurred? Does the regimental or battalion board, in directing the paymaster to provide for the necessities of a company, run the risk that, because of the subsequent default of that company, there may be no means of paying for the necessaries? Or assume, with the relator, that he is entitled to the appropriation at the beginning of the year. Then, undoubtedly, he would proceed in its legitimate expenditure until the company had made default; and after

that, how could "the annual appropriation" be forfeited, when some of it had been previously enjoyed? It is probable that the difficulties in the way of enforcing this enactment according to its terms led to its repeal in 1885 (*Rev. Sup., p.* 472, § 78). Its most practicable construction seems to be that after forfeiture the company should derive no further benefit from the annual appropriation. But this construction renders it quite unimportant whether the fund is lodged with the paymaster or the treasurer.

In my judgment, none of these considerations will justify a departure from the direction given by the plain words of the thirty-ninth section above quoted. The annual appropriation of $500 is due to the paymaster on the first Monday of April for each company duly organized which at that time is attached to his regiment.

This being the construction placed by the court upon the statute, and the attorney general having expressed his belief that the uniform practice of the state officers had been to pay these allowances only at or after the end of the year for which they were made, it was ordered that evidence be taken on this point. Such evidence is now before us, and shows that the opposite practice has generally prevailed. The statute went into effect March 9th, 1869, and the national guard was organized in companies and regiments under it on April 14th, 1869. The treasurer began to make payments to the regimental paymasters, on account of the companies attached to their respective regiments, in May, 1869, and paid almost the entire allowances for that year before September, 1869. Similarly, the allowances for the year ending in April, 1871, were paid in the year 1870; those for the year ending April, 1872, in 1871, and so on until the present controversy. Clearly, the practice of the state officers originated and continued under the belief that the allowances were payable in advance.

It is further urged, on behalf of the comptroller, that the duty of that officer is not such as can be enforced by *mandamus;* that it requires the exercise of his judgment and dis-

·cretion to determine whether the payment demanded is justly due. But, according to the state of the case before us, the comptroller has exercised his judgment so far as to ascertain the existence of the facts which render the payment due, provided the law requires the annual appropriations to be transferred to the paymasters in advance, and the question as to what the law requires is one upon which the judgment of the comptroller must be guided by that of the courts. Interpreting the statute as we have done, and taking the facts as the comptroller presents them, there is no place for the further exercise of discretion, and only the ministerial duty of drawing and delivering the warrant for payment remains. That duty can be enforced by *mandamus*. *Angle* v. *Comptroller*, 9 *Vroom* 403.

If, therefore, matters still stood as they appeared when the case was first presented, the rule for a peremptory *mandamus* should be made absolute, but the testimony lately taken shows that the allowances due in April, 1886, were paid pending these proceedings, and consequently the writ should not now be issued.